UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BOODRAM DUDNAUTH, *on behalf of
himself and all others similarly situated*,

Plaintiffs,

– against –

A.B.C. CARPET & HOME INC., ABC
HOLDCO 1 LLC, PAULETTE COLE, DINESH
SEWNAUTH, *and* SYLVESTER CYRAN,

Defendants.

**OPINION & ORDER**

23 Civ. 1858 (ER)

RAMOS, D.J.:

Boodram Dudnauth brings this putative class action against A.B.C. Carpet &

Home, Inc. ("A.B.C. Carpet & Home"), ABC Holdco 1 LLC ("ABC Holdco"), Paulette

Cole, Dinesh Sewnauth, and Sylvester Cyran (collectively, "Defendants"), alleging

claims under the Fair Labor Standards Act ("FLSA"), New York Labor Law ("NYLL"),

and the New York State Human Rights Law ("NYSHRL").  He claims Defendants failed

to pay him overtime wages in violation of the FLSA and NYLL, failed to pay him on a

weekly basis and to provide proper wage and notice statements in violation of the NYLL,

and discriminated against him based on his age and disability in violation of the

NYSHRL.

Before the Court is Defendants' motion for summary judgment.  For the reasons

set forth below, the motion is GRANTED in part and DENIED in part.

I.    **BACKGROUND**

  **A. Factual Background**[1]

  *1. The Parties*

  Dudnauth worked in the rug department of A.B.C. Carpet & Home for

---

[1] The following facts are taken from Defendants' Local Rule 56.1 Statement, and Dudnauth's responses
thereto, Doc. 46 (Dudnauth's Response to Defendants' Rule 56.1(a) Statement).  The facts recited here are
undisputed unless otherwise noted.

approximately 30 years, until October 2021.  Doc. 46 ¶¶ 1, 13, 13(a);[2] *see also* Doc. 45 at 16.  Defendant Sewnauth, who hired Dudnauth, was Vice President of Operations (Rug Division) there since 1982.  Doc. 46 ¶¶ 10, 13.  Defendant Cyran held various positions in A.B.C. Carpet & Home since 1992, including Director of Antiques and Art Restoration (Home Division), Buyer and Senior Buyer (Home Division), Divisional Merchandise manager (Home Division) and Vice President of Operations.  *Id.* ¶ 11.  Cyran never had any interactions with Dudnauth.  *Id.* ¶ 12.  Defendant Cole was A.B.C. Carpet & Home's largest shareholder.  *Id.* ¶ 12.  Cole also never had any interactions with Dudnauth.  *Id.*

Each of Dudnauth, Sewnauth, and Cyran remained employed at A.B.C. Carpet & Home until the company filed for bankruptcy and dissolved in October 2021.  *Id.* ¶¶ 1, 10, 11.  As further discussed below, ABC Holdco—an entity which purchased all of A.B.C. Carpet & Home's assets through the bankruptcy—subsequently hired Dudnauth, Sewnauth, and Cyran.  *Id.* ¶¶ 17, 20, 21, 27.  Dudnauth remained employed at ABC Holdco until June 2022.  *Id.* ¶ 39.

### 2. *Dudnauth's Employment at A.B.C. Carpet & Home*

The parties dispute the specifics of Dudnauth's employment at A.B.C. Carpet & Home.  Defendants state that Sewnauth initially hired Dudnauth in the 1990s, and that sometime in the early 1990s, he promoted Dudnauth to the role of Supervisor of Rugs.  *Id.* ¶ 13.  They state that, "[i]n his role of Supervisor, Plaintiff supervised approximately 15 to 20 full-time union employees."  *Id.* ¶ 14.  They elaborate:

> [Dudnauth] would schedule their shifts, train new employees, he would be involved and make recommendations about the hiring and firing of employees, and discipline employees when appropriate.  [Dudnauth] was

---

[2] There are conflicting accounts of when Dudnauth began working at A.B.C. Carpet & Home.  The complaint states that his employment began in 1984, Doc. 1 ¶ 8, however Dudnauth states in his affidavit that he began working "around 1985," Doc. 45-2 ¶ 1.  Defendants state, in their 56.1 statement, that Dudnauth was initially hired in the 1990s.  Doc. 36 ¶ 13.  Dudnauth disputes that statement and states that he "began working for Defendants in 1985."  Doc. 46 ¶ 13(a).  There is no dispute that Dudnauth's employment at A.B.C. Carpet & Home ended when the company filed for bankruptcy and dissolved in October 2021.  Doc. 1 ¶ 8; Doc. 46 ¶¶ 10, 10(a).

responsible for the rug inventory and ensuring customers received the proper merchandise.

*Id.* ¶ 15.

Dudnauth, on the other hand, states that he began working for Defendants in 1985, and that "[t]here is no documentation reflecting that [he] ever held the position of 'supervisor.'"  *Id.* ¶ 13(a).  He states that his primary duty during his employment was "performing manual labor for the Defendants."  *Id.*  In his affidavit, he elaborates:  "My duties as a rug flipper from 1985 until I was terminated in 2021 included turning rugs with other employees for customers in the store to view and potentially purchase.  I would also stock these rugs and put them away."  Doc. 45-2 ¶ 3.  Dudnauth states that, although at some point in the 1990s, Sewnauth told him he was "no longer part of the union" and "could 'supervise' some other employees," he was not in fact the supervisor of those sixteen to eighteen other workers.  *Id.* ¶¶ 4, 5; Doc. 46 ¶¶ 14(a), 15(a).  Rather, he states, he worked as a rug flipper and stocker alongside them, doing the same work they did.  Doc. 46 ¶¶ 14(a), 15(a).  Dudnauth additionally states that although Sewnauth would give him the other employees' schedules, his role was simply to check off their names on the list.  Doc. 45-2 ¶ 6.  He states that employees would go to Sewnauth, not to him, if they had any issues "such as issues with their pay, complaints, or time off requests."  *Id.* ¶ 7.  Moreover, Dudnauth states he:

- Did not hire or fire any employee;
- Was not involved in any decisions to hire or fire any employee;
- Did not discipline any employee;
- Did not give any promotions or pay raises to any employee;
- Did not maintain any sales records or determine which products should be sold in or bought for the store; and
- Did not plan any budgets for the store.

*Id.* ¶¶ 8–12.  Finally, Dudnauth states in his affidavit that Sewnauth would tell him what duties to perform, including which tasks and work to complete on a given day; moreover, Dudnauth "would need to ask [Sewnauth] permission to unload any shipments from trucks."  *Id.* ¶ 13.

Dudnauth alleges that he worked from approximately 9:30 a.m. to 7:00 p.m., five or six days per week, that is, 47.5 to 57 total hours per week. Doc. 1 ¶¶ 36–38. He alleges that Defendants did not pay him a rate of time and a half for hours he worked over forty (40) in a work week. *Id.* ¶ 40. Specifically, Dudnauth alleges that Defendants paid him a flat hourly rate of $21.00 for all hours worked between February 2017 and December 2018, and $23.50 for all hours worked between January 2019 and October 2021. *Id.* ¶ 39. Moreover, he alleges that Defendants paid him on a bi-weekly basis, thus violating NYLL requirements that he be paid weekly as a manual worker. *Id.* ¶ 41; NYLL § 191(1)(a).

### 3. *A.B.C. Carpet & Home's Bankruptcy*

In 2021, A.B.C. Carpet & Home's employees were informed that the company was in financial distress. Doc. 46 ¶ 17. That year, the company filed for bankruptcy in the United States Bankruptcy Court, Southern District of New York (the "Bankruptcy Court"). *Id.* ¶¶ 1, 2; *see In re ABC Carpet Co., Inc., et al.*, Case No. 21-11591 (DSJ) (Bankr. S.D.N.Y.).[3] Defendants claim that Dudnauth was served with notices and forms with respect to the filing of claims with the Bankruptcy Court on October 8, 2021, and that he did not file any notice of claim with the Bankruptcy Court. Doc. 46 ¶¶ 3, 4. Dudnauth states he does not recall being notified of the bankruptcy, and therefore he was not able to file a notice of claim within the appropriate time period. *Id.* ¶¶ 3(a), 4(a).

In an order dated October 27, 2021 (the "Bankruptcy Order"), the Bankruptcy Court approved A.B.C. Carpet & Home's sale of all assets to ABC Holdco,[4] free and clear of any debts or liabilities. *Id.* ¶ 5; *see also* Doc. 38 at ECF 122. The Bankruptcy Court held that the asset purchase agreement governing that sale "was negotiated, proposed, and entered into by the Debtors and the Buyer without collusion, in good faith,

---

[3] The docket of bankruptcy Case No. 21-11591 identifies the debtor as "A.B.C. Carpet Co., Inc.," "*aka* ABC Carpet & Home," "*aka* ABC Carpet."

[4] The Purchase Agreement identifies the Buyer as 888 Capital Partners, LLC, a wholly-owned subsidiary of ABC Holdco. Doc. 38 at ECF 92, 101.

and from arm's-length bargaining positions." Doc. 46 ¶ 6; Doc. 38 at ECF 101. The

Bankruptcy Court additionally declared that ABC Holdco is not a successor to A.B.C.

Carpet & Home, holding:

> Neither [ABC Holdco] nor any of its affiliates are successors to [A.B.C.
> Carpet & Home] or their estates of any theory of law or equity, and neither
> [ABC Holdco] nor any of its affiliates shall assume or in any way be
> responsible for any liability or obligation of [A.B.C. Carpet & Home] . . . .

Doc. 46 ¶ 7; *see also* Doc. 38 at ECF 104–105. Dudnauth does not dispute that the

Bankruptcy Court made these findings, however he argues that they are not applicable to

employment cases. Doc. 46 ¶¶ 7(a), 8(a). The parties agree that, "[i]n examining the

docket sheet, it does not appear that the bankruptcy trustee/court has been served with the

summons and complaint in this matter." *Id.* ¶ 9.

Dudnauth, like all other A.B.C. Carpet & Home employees, lost his job upon the

company's bankruptcy and dissolution in October 2021. *Id.* ¶¶ 10, 16. However, ABC

Holdco hired some of A.B.C. Carpet & Home's former employees—including Sewnauth

as Vice President of the Rug Division, and Cyran as Vice President of Operations. *Id.*

¶¶ 20, 21. Defendants state that fewer than 25% of the total employees hired by ABC

Holdco previously worked at A.B.C. Carpet & Home. *Id.* ¶ 22. In November 2021,

Dudnauth was also hired into the new company. *Id.* ¶ 27.

### 4. *Dudnauth's Employment at ABC Holdco*

Dudnauth was hired into ABC Holdco as Supervisor of Rugs in the

Shipping/Logistics area. *Id.* At the time he was hired, Dudnauth was 63 years old. *Id.*

¶ 28. At ABC Holdco, Dudnauth received paystubs with every paycheck. *Id.* ¶ 30.

The parties dispute certain specifics of Dudnauth's employment at ABC Holdco.

First, Defendants state, but Dudnauth disputes, that, "[a]t the time of hire . . . [Dudnauth]

was informed in writing about his salary, bi-monthly nature of his pay, his employer and

other information." *Id.* ¶¶ 29, 29(a). Second, Defendants state that Dudnauth "performed

the same duties as he had previously performed at A.B.C. Carpet & Home, Inc. as the

Supervisor of Rugs." *Id.* ¶ 31.  Dudnauth disputes that statement as well, explaining that

he "performed the duties of a rug flipper and was [] not a supervisor, as he worked

alongside other employees as a manual laborer." *Id.* ¶ 31(a).  Third, as to Dudnauth's

hours, Defendants state that he "always worked from 10:00 am to 6:00 pm, five days per

week, with a meal period each day," whereas Dudnauth states his "usual schedule was

9:30 a.m. to 7:00 p.m. five days per week, then [it] changed to 10:00 a.m. to 6:00 p.m.

five days per week." *Id.* ¶¶ 32, 32(a).[5]  Finally, Defendants state that although Dudnauth

was an exempt employee, he never worked more than 40 hours per week at any time

during his employment at ABC Holdco.  *Id.* ¶ 33.  Dudnauth disputes that statement,

however he elaborates only by stating that he was not an exempt employee.  *Id.* ¶ 33(a).

On April 28, 2022, Dudnauth reported to work at ABC Holdco for the last time.

*Id.* ¶ 34.  Defendants state that Dudnauth "subsequently called out sick and never

reported to work." *Id.* ¶ 35.  Dudnauth disputes that statement, explaining that he

provided multiple doctor's letters to Defendants after being diagnosed with his disability

and that Defendants were "aware and informed of his disability."  *Id.* ¶ 35(a).

ABC Holdco received a letter, dated May 11, 2022, from Dudnauth's medical

provider, which stated that Dudnauth was "suffering a lot of weakness," "had temperature

changes all over his body" and was "having extreme dizziness."  *Id.* ¶¶ 35, 36; *see also*

Doc. 45-5 at 4.  The doctor's letter continued:  "I have advised him complete bed rest for

the next two weeks.  I would be very grateful if he can be accommodated for his absence

at work."  Doc. 45-5 at 4.  Defendants state that, "[d]uring this period of time, rug sales

and other sales were down and the [company] was contemplating layoffs."  Doc. 46 ¶ 37.

Defendants state that ABC Holdco received a second letter from Dudnauth's

medical provider, dated May 25, 2022.  Doc. 37 at 7.  Unlike the May 11 letter, which

was handwritten in free-form on a blank piece of paper, the May 25 letter was a form

---

[5] However, as discussed below, Dudnauth testified at his deposition that the 9:30 a.m. to 7:00 p.m. schedule
applied to his employment at A.B.C. Carpet & Home, not at ABC Holdco.

letter, with fields including "Diagnosis," "Prognosis," "Recommendation(s)," "Pt may return to work/school on," and "With/Without restrictions," each followed by a blank line for the medical provider to fill in. *Compare* Doc. 45-5 at 4 *with id.* at 3. In that May 25 letter, the medical provider indicated that the diagnosis was "Vertigo, lower back pain," the prognosis was "FAIR," the recommendation was "Referred to Neurologist, take meds," and the date on which Dudnauth may return to work was noted as May 30, 2022. *Id.* at 3. The "With/Without restrictions" field was left blank and unmarked. *Id.*

ABC Holdco received a third communication from Dudnauth's medical provider, dated May 28, 2022. Doc. 46 ¶ 38;[6] Doc. 45-5 at 2. The May 28 form letter included the same fields as the May 25 letter. Doc. 45-5 at 2. This time, the medical provider indicated that the diagnosis was "lower back pain" and "knee pain," the prognosis was "guarded," the recommendation was "rest" and "medication," and the date on which Dudnauth may return to work was noted as June 20, 2022; the provider also circled the phrase "Without restrictions." *Id.*

Defendants claim that, on June 1, 2022, Sewnauth received a call from Dudnauth, who informed him that he could not return to work under any circumstances, that he was "unfit" to return to work, and that there was nothing the company could do for him. Doc. 46 ¶¶ 39, 40. Defendants state that Dudnauth said he wanted to collect disability and unemployment insurance benefits. *Id.* ¶ 41. They state that, in response, Sewnauth informed Dudnauth that he would have to contact the human resources department to obtain forms necessary for applying for disability benefits, and that he could only collect unemployment benefits if he was terminated. *Id.* ¶ 42. Defendants state that Dudnauth never spoke to Sewnauth after June 1, 2022. *Id.* ¶ 43. Defendants separately reiterate

---

[6] There are four total letters from Dudnauth's medical providers in the record, dated May 11, May 25, May 28, and June 20, 2022. *See* Doc. 45-5. Although Dudnauth states in his opposition to Defendants' motion for summary judgment that he submitted just three doctor's notes to ABC Holdco, "two from May visits and one from his June visit – requesting a leave of absence," Doc. 45 at 7, he testified at his deposition that he sent all four letters to his employer, Doc. 45-1 at 18.

that Dudnauth "admitted that there was no accommodation that ABC Holdco could have provided him that would have enabled him to perform the essential functions of his job." *Id.* ¶ 48. Dudnauth disputes each of these statements. *See id.* ¶¶ 39(a), 40(a), 41(a), 42(a), 43(a), 48(a).

Dudnauth, on the other hand, states that it was he who received a call from Sewnauth—though he does not specify on what date—in which Sewnauth told him to stop sending doctor's letters and "that he was no longer an employee of the company." *Id.* ¶¶ 39(a), 43(a). Dudnauth also denies telling Sewnauth that "there [was] nothing the Company [could] do for him." *Id.* ¶ 40(a). Dudnauth states that he continued to send Sewnauth letters from his doctor indicating his condition,[7] however:

> No one from ABC Holdco, including Sewnauth, engaged in the interactive process with [Dudnauth] to determine which accommodations he needed due to his disability, though [Dudnauth] kept the company updated about his conditions through regular phone calls and doctor note submissions.

*Id.* Dudnauth also disputes Defendants' account of his request for disability and unemployment insurance benefits. He states that he had asked Defendants for instructions or paperwork to apply for benefits ever since he requested a leave of absence. *Id.* ¶ 41(a). However, Dudnauth states, "Defendants refused and instead pressured [him] to sign a severance agreement." *Id.* Dudnauth additionally states that "Sewnauth never told [him] that he would need to speak to the Human Resources Department to apply for disability benefits," and "instead he instructed him to sign a severance agreement and refused to provide any other assistance for [his] benefits." *Id.* ¶ 42(a).[8] It is undisputed

---

[7] As further discussed below, Dudnauth obtained a fourth doctor's note, dated June 20, 2022, which stated that he may return to work on July 4, 2022. Doc. 45-5 at 1.

[8] At his deposition, Dudnauth testified: "[W]hat they did to me, they sent me a letter to sign; right? To sign this letter they will give me, approximately, $2,000. Approximately, $2,000 to sign the letter and send it back to them." Doc. 45-1 at 20. When asked on what date Dudnauth received that letter, Dudnauth stated he did not recall; counsel for Defendants, however, stated in the deposition that Dudnauth received it on June 6, 2022. Doc. 45-1 at 20, 21.

that Dudnauth declined the severance agreement offered by ABC Holdco.  *Id.* ¶¶ 46, 46(a).

5.  *Termination of Dudnauth's Employment at ABC Holdco*

According to deposition testimony, Dudnauth's employment at ABC Holdco was terminated on June 6, 2022.[9]  Dudnauth states that he made an attempt to provide another doctor's note,[10] however, "Defendants told him to stop sending doctor's notes and that he [was] no longer with the company."  Doc. 46 ¶ 43(a).  Indeed, the record includes a fourth letter from Dudnauth's medical provider, dated June 20, 2022, in which the medical provider indicated the diagnosis was "Gait instability and dizziness and back pain," the prognosis was "Fair," the recommendation was "Get plenty of rest.  Take medications as prescribed," and the date on which Dudnauth may return to work was noted as July 4, 2022, again with a circle around "Without restrictions."  Doc. 45-5 at 1.  Appearing to refer to this June 20 letter, Dudnauth testified at his deposition:

> And the next letter I sent to them they called me home and said do not send anymore letters from the doctor . . . Do not send anymore letter.  I said why?  I'm sick.  You got to give me some time.  I'm sick.  Oh, do not send anymore letters.  You're no longer in the company anymore.  That's what they told me.  You're no longer in the company anymore.

Doc. 45-1 at 18.

As previously discussed, Defendants state, but Dudnauth disputes, that Dudnauth "admitted that there was no accommodation that ABC HoldCo could have provided him that would have enabled him to perform the essential functions of his job."  Doc. 46 ¶ 48.  In disputing that statement, Dudnauth states that, while he "was unable to perform his duties on June 22, 2022," he was cleared to return to work on July 4, 2022.  *Id.* ¶ 48(a).

---

[9] Counsel for Defendants asked Dudnauth:  "And is it fair to say that in June – let's say June 6th, 2022, your employment was terminated from A.B.C. new company?"  Doc. 45-1 at 11.  Dudnauth answered: "New company, yes."  *Id.*

[10] As discussed above, Dudnauth disputes Defendants' statement that he never spoke with Sewnauth after June 1, 2022.

At his deposition, Dudnauth testified that he suffered from back pain and dizziness, ever since April 2022.  Doc. 45-1 at 15–17.  The deposition continued as follows:

> Q. Okay.  And these conditions existed from that date until the present?
> A. Until present, yes.
> Q. Okay.  And did these conditions prevent you from doing your job?
> A. Yes.
> Q. Did these conditions – is there anything that could be done to help you perform your job?
> A. No, because I'm sick.
> Q. Okay.  So there's nothing that ABC Holdco could have done to help you perform your job with these conditions?
> A. Well, when I sick, I keep on sending doctor note.
> Q. Correct.
> A. When I send a doctor note . . . that the doctor said I need more rest because I'm not feeling good and I have this pain and everything . . . I sent four letters to them.

Doc. 45-1 at 17–18.

Defendants state that, in June 2022, the company decided to eliminate Dudnauth's position—Supervisor of Rugs—due to a decline in rug sales.  Doc. 46 ¶ 44.  Defendants state they additionally terminated Julie Ju, who was a buyer.  *Id.*  They note that, at the time, Ju was 30 years old and did not suffer from a disability.  *Id.* ¶ 45.  Defendants also state that, like Dudnauth, Ju was offered a severance agreement.  *Id.* ¶ 46.  Dudnauth "denies any knowledge or information" regarding Ju's termination, and he contests the relevance of Defendants' statements regarding her age, health, and severance agreement offer.  *Id.* ¶¶ 44(a), 45(a), 46(a).

It is undisputed that Dudnauth has not sought any employment since his termination from ABC Holdco, because he is "unable to perform any work."  *Id.* ¶ 49.  Defendants provide that, to date, ABC Holdco has not replaced Dudnauth's position.  *Id.* ¶ 47.

**B.  Procedural History**

Dudnauth filed this action on March 3, 2023, alleging wage and hour violations of the FLSA and NYLL, as well as age and disability discrimination in violation of the

NYSHRL.  Doc. 1.  Defendants deposed Dudnauth on January 30, 2024.  *See* Doc. 45-1.
On September 26, 2024, Defendants moved for summary judgment.  Doc. 35.

## II.  LEGAL STANDARDS

Summary judgment is appropriate where "the movant shows that there is no
genuine dispute as to any material fact and the movant is entitled to judgment as a matter
of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a
reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford*
*Union Free School District*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint*
*Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it
might affect the outcome of the litigation under the governing law.  *Id.*  The party moving
for summary judgment is first responsible for demonstrating the absence of any genuine
issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving
party meets its burden, "the nonmoving party must come forward with admissible
evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary
judgment."  *Saenger v. Montefiore Medical Center*, 706 F. Supp. 2d 494, 504 (S.D.N.Y.
2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in
the light most favorable to the non-moving party and must resolve all ambiguities and
draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156,
164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir.
2004)).  However, in opposing a motion for summary judgment, the non-moving party
may not rely on unsupported assertions, conjecture or speculation.  *Kulak v. City of New*
*York*, 88 F.3d 63, 71 (2d Cir. 1996); *see also Ridinger v. Dow Jones & Co.*, 651 F.3d 309,
317 (2d Cir. 2011).  To defeat a motion for summary judgment, "the non-moving party
must set forth significant, probative evidence on which a reasonable fact-finder could
decide in its favor."  *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby,*
*Inc.*, 477 U.S. 242, 256–57 (1986)).

### III.    DISCUSSION

#### A.  Discrimination Claims

Dudnauth pursues two theories of discrimination under the NYSHRL:  failure to accommodate, and discriminatory discharge based on age and disability.[11]  Defendants contend that Dudnauth fails to establish a *prima facie* case of discrimination, and that even if he did, Defendants offer a legitimate, non-pretextual reason for his termination. The Court finds that Dudnauth has failed to establish a *prima facie* case of discrimination as to all discrimination claims.

##### 1.  *Discrimination Claim Based on Failure to Accommodate*

Dudnauth argues that "Defendants failed to provide [him] with a reasonable accommodation in which he could perform the essential functions of his job – more specifically a leave of absence until July 4, 2022."  Doc. 45 at 10.  He argues that Defendants did not even attempt to engage in a good faith interactive process with him to ascertain any accommodation that would help him to perform the essential functions of his job, and instead, Defendants terminated him in the hopes of avoiding their obligations under the law.  *Id.* at 12.

"NYSHRL claims are analyzed as [Americans with Disabilities Act ("ADA")] claims[.]"  *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 76 (2d Cir. 2019); *see also McKenna v. Santander Investment Securities Inc.*, No. 21 Civ. 941 (DLC), 2022 WL 2986588, *7 (S.D.N.Y. July 28, 2022) ("Claims under the NYSHRL for a failure to accommodate are governed by the same legal standards as federal ADA claims." (citing *Fox*, 918 F.3d at 76)).  "Discrimination under the ADA includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue

---

[11] Dudnauth did not assert a federal Age Discrimination in Employment Act claim.

hardship on the operation of the business of such covered entity.'" *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008) (quoting 42 U.S.C. § 12112(b)(5)(A)).

Under the ADA and NYSHRL, an employer is required to afford reasonable accommodation of an employee's known disability unless the accommodation would impose an undue hardship on the employer. *Noll v. International Business Machines Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (citing 42 U.S.C. § 12112(b)(5)(A); N.Y. Exec. L. 296(3)(a)); *Vangas v. Montefiore Medical Center*, 6 F. Supp. 3d 400, 412 (S.D.N.Y. 2014) (citing N.Y.C. Admin. Code §§ 8-107(15)(a), 8-102(18)).  To maintain a *prima facie* case based on discrimination for failure to accommodate, a plaintiff employee must establish by a preponderance of the evidence that:  "(1) he is disabled within the meaning of the ADA; (2) his employer is a covered entity; (3) he could perform the essential functions of his job with an accommodation; and (4) the defendants refused to provide such an accommodation despite being on notice." *Fox*, 918 F.3d at 73 (quoting *McBride v. BIC Consumer Products Manufacturing Co., Inc.*, 583 F.3d 92, 96–97 (2d Cir. 2009)); *Nieblas-Love v. New York City Housing Authority*, 165 F. Supp. 3d 51, 73 (S.D.N.Y. 2016) (citing, inter alia, *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004)); *see also Noll*, 787 F.3d at 94.

For purposes of the instant motion, Defendants do not dispute that Dudnauth has met the first two elements of a *prima facie* case of discrimination for failure to accommodate.  Doc. 37 at 12.[12]  Accordingly, the only questions before the Court are whether there is a genuine dispute over whether Dudnauth could perform the essential

---

[12] Defendants' statement that they do not dispute these facts is made in the context of their argument against Dudnauth's discrimination claim based on termination, not on failure to accommodate.  *See* Doc. 37 at 12.  Still, in their reply—where they address the failure to accommodate claim for the first time—Defendants argue against the *prima facie* case by stating only that they "accommodated [Dudnauth] and provided him with leave . . . and extensions to those leaves as per the notes," and that "there were no other accommodations ABC HoldCo could have provided him to perform his job."  Doc. 50 at 8.  Therefore, Defendants clearly do not contest the first two *prima facie* elements of the failure to accommodate claim.

functions of his job with an accommodation, and whether Defendants refused to provide him with a reasonable accommodation.

Once an employer has notice of an employee's disability, both parties must engage in an "an informal and flexible 'interactive process' meant to determine whether and how an employer can reasonably accommodate its employee." *Goonan v. Federal Reserve Bank of New York*, No. 12 Civ. 3859 (JPO), 2014 WL 3610990, at *5 (S.D.N.Y. July 22, 2014); *see also Brady*, 531 F.3d at 135–36 (holding that employer was obligated to engage in the interactive process where employee's disability was obvious, even in the absence of a specific request from the employee); *Noel v. BNY-Mellon Corp.*, 514 F. App'x 9, 10 (2d Cir. 2013) (summary order) (noting that the NYSHRL and NYCHRL also require participation in an interactive process). "This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3).

The New York Court of Appeals has stated that, under the NYSHRL, failure to engage in the interactive process is generally sufficient to foreclose summary judgment in favor of the employer. *Jacobsen v. New York City Health and Hospitals Corp.*, 11 N.E.3d 159, 169 (N.Y. 2014) (internal citations and quotation marks omitted) (holding that the NYSHRL requires employers to engage in a good faith interactive process to assess "the needs of the disabled individual and the reasonableness of the accommodation requested" and that "[w]ithout having participated in that process . . . the employer cannot prevent the employee from bringing a State HRL claim to trial on the reasonable accommodation issue"). The *Jacobsen* court took care to note, however, that plaintiffs ultimately bear the burden to prove, at trial, that there existed a "reasonable accommodation that would have enabled the employee to perform the essential functions of his or her position." *Id.* Therefore, it explained, a good faith interactive process is not "an independent element of the disability discrimination analysis . . . which if lacking, automatically compels a grant of summary judgment to the employee or a verdict in the

14

employee's favor." *Id.* In fact, in *Lazzari v. New York City Department of Parks & Recreation*, the Second Circuit upheld the district court's grant of summary judgment for the employer defendant on a NYSHRL claim, notwithstanding that the plaintiff claimed his employer refused to engage in an interactive process. 751 F. App'x 100, 103 (2d Cir. 2018) (summary order). The Second Circuit stated that the plaintiff's "sweeping argument that an employer is categorically precluded from obtaining summary judgment under the NYSHRL unless the employer engaged in a good faith interaction with the employee about a requested accommodation rests on a misinterpretation of *Jacobsen*." *Id.* (citing *Jacobsen*, 11 N.E.3d 159). Therefore, having found that "regular attendance was an essential function of a maintenance worker" like the plaintiff, the Second Circuit affirmed the district court's grant of summary judgment because the plaintiff "fail[ed] to carry his burden of showing a reasonable accommodation that would have enabled him to perform the essential function of showing up to work." *Id.*; *cf. Jacobsen*, 11 N.E.3d at 169 (explaining that, unlike the NYSHRL, the NYCHRL "unquestionably forecloses summary judgment where the employer has not engaged in a good faith interactive process regarding a specifically requested accommodation" because the NYCHRL "provides broader protections against disability discrimination" than the NYSHRL).

Here, independent of whether Defendants engaged in a good faith interactive process, there is no genuine dispute of material fact that Defendants could not have provided any accommodation for Dudnauth to "perform the essential functions" of his job. *McBride*, 583 F.3d at 97; *see Jacobsen*, 11 N.E.3d at 169 ("[T]he employer's decision to engage in or forgo an interactive process is but one factor to be considered in deciding whether a reasonable accommodation was available for the employee's disability at the time the employee sought accommodation."). Defendants state, though Dudnauth contests, that Dudnauth himself told Sewnauth on June 1, 2022 that he was "unfit" to return to work, and that there was nothing the company could do for him. Doc. 46 ¶ 40. Even if Dudnauth did not make those assertions, he later testified under oath in

his January 30, 2024 deposition that his physical limitations from April 2022 persisted through the present, that the conditions prevented him from doing his job, that there was nothing that could be done to help him perform his job due to his condition, and that he could not perform the duties "today" that he was able to perform while employed.  Doc. 45-1 at 15–17, 19.  Moreover, Dudnauth does not now dispute that he "has not sought any employment since his termination from ABC Holdco, because he is unable to perform any work."  Doc. 46 ¶ 49.

Dudnauth's explicit acknowledgement that his persistent illness precludes him from performing his job with or without accommodations compels a finding that he cannot meet the third element of the *prima facie* case.  *See Parker v. Columbia Pictures Industries*, 204 F.3d 326, 338 (2d Cir. 2000) ("The duty to make reasonable accommodations does not . . . require an employer to hold an injured employee's position open indefinitely while the employee attempts to recover."); *cf. LaCourt v. Shenanigans Knits, Ltd.*, 38 Misc. 3d 1206(A), 966 N.Y.S.2d 347, at *6 (Sup. Ct. 2012) ("[R]egulations implementing the NYSHRL provide that a temporarily disabled employee is protected by the law 'where the individual will be able to satisfactorily perform the duties of the job after a reasonable accommodation in the form of a reasonable time for recovery.'" (quoting 9 NYCRR § 466.11(i)(1))); *id.* at *7 (finding a two-to-three- or even seven-to-eight-month temporary leave from employment was not an unreasonable accommodation, in part because there was "no evidence that plaintiff was seeking an indefinite leave, or that she would have been unable to perform the functions of her job if granted time to recover.").  Dudnauth does not now "come forward with admissible evidence sufficient to raise a genuine issue of fact for trial" that he could have ultimately resumed work had Defendants granted his requested extension of leave— or provided him any other accommodation.  *Saenger*, 706 F. Supp. 2d at 504 (citation omitted).  Therefore, in light of his deposition testimony, there is no genuine dispute of material fact that Dudnauth could not "perform the essential functions of his job with an

accommodation." *Fox*, 918 F.3d at 73; *see, e.g.*, *Matias v. Montefiore Medical Center*, No. 20 Civ. 2849 (VEC), 2022 WL 4448585, at *10 (S.D.N.Y. Sept. 23, 2022) ("Plaintiff has simply provided no evidence that, given her physical limitations, any proposed accommodation would have allowed her to perform the essential functions of her job; without such evidence, she cannot make out a prima facie case of disability discrimination."); *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) ("[W]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." (quoting *CILP Associates, L.P. v. Price Waterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013))); *see also Miloscia v. B.R. Guest Holdings LLC*, 33 Misc. 3d 466, 475, 928 N.Y.S.2d 905, 914 (Sup. Ct. 2011) (internal citations and quotation marks omitted) ("[A] requested leave of absence is an unreasonable request for accommodation, only in unusual circumstances, . . . [for example] . . . where it is clear that, even when the employee returns from the requested leave of absence, he or she will still be unqualified to perform the essential functions of their job."), *aff'd in part, modified in part*, 94 A.D.3d 563, 942 N.Y.S.2d 484 (2012). Therefore, the Court grants summary judgment on the failure to accommodate claim.

### 2. *Discrimination Claims Based on Termination*

Dudnauth's age and disability discrimination claims based on his termination are properly analyzed under the three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Asiedu v. Broadreach Medical Resources*, 19 Civ. 11825 (ER), 2022 WL 4237077 (S.D.N.Y. Sept. 13, 2022). A plaintiff's first step under *McDonnell Douglas* is to establish a *prima facie* case of discrimination. *Banks v. General Motors*, LLC, 81 F.4th 242, 270 (2d Cir. 2023) (quoting *Weinstock v. Columbia University*, 224 F.3d 33, 42 (2d Cir. 2000)).

The burden at this stage "is not onerous." *Id.* (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Once the plaintiff has

17

established a *prima facie* case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its adverse action. *Vega v. Hempstead Union Free School District*, 801 F.3d 72, 83 (2d Cir. 2015) (quoting *McDonnell Douglas*, 411 U.S. at 802). Upon that showing, the burden then shifts back to the plaintiff to prove that the employer's stated reason was pretext for discrimination. *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 804); *Banks*, 81 F.4th at 270–71 (citing *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011)).

    *a.  Age Discrimination*

In order to establish *a prima facie* case of age discrimination, Dudnauth must show that: (1) "he was within the protected age group"; (2) "he was qualified for the position"; (3) "he was subject to an adverse employment action"; and (4) "the adverse action occurred under 'circumstances giving rise to an inference of discrimination.'" *Terry v. Ashcroft*, 336 F.3d 128, 137–38 (2d Cir. 2003) (citation omitted); *see also Arnold v. Research Foundation for State University of New York*, 216 F. Supp. 3d 275, 288 (E.D.N.Y. 2016) (NYSHRL). Defendants contest only the second and fourth elements of Dudnauth's *prima facie* case for age discrimination, arguing that Dudnauth "cannot establish that he was qualified for the position or that the layoff occurred under the circumstances giving rise to an inference of discrimination." Doc. 37 at 11.

With respect to the second element, Dudnauth argues that he "was clearly qualified, in both skills and experience, to perform his job duties," as evidenced by the fact that he worked for Defendants for over thirty years prior to his termination. Doc. 45 at 7; *see also id.* at 6 (citing to *Memisevich v. St. Elizabeth's Medical Center*, 443 F. Supp. 2d 276, 284 (N.D.N.Y. 2006) ("For plaintiff to show that he was qualified according to the employer's criteria, 'plaintiff need . . . only [demonstrate] that he possesses the basic skills necessary for performance of the job.'"). He states that Defendants "fail to produce any evidence that Plaintiff was not qualified for the job outside of his disability," and that "using Defendants' erroneous criterion on this element, every disabled employee who

could not work for a period of time due to their disability would be suddenly unqualified for their position." *Id.* at 7.

In discussing the second element of the *prima facie* framework, the Second Circuit has explained that "employers may not discriminate against people with disabilities that do not prevent job performance"; nonetheless, the Second Circuit continues, "when a disability renders a person unable to perform the essential functions of the job, that disability renders him or her unqualified." *Stevens v. Rite Aid Corp.*, 851 F.3d 224, 229 (2d Cir. 2017). Here, notwithstanding that Dudnauth may have had the fundamental skills and expertise to perform his role when he was hired at ABC Holdco, the record shows that his subsequent disability rendered him "unable to perform" it, *id.*, because as previously discussed, there is no genuine dispute of material fact that there is no reasonable accommodation that would have enabled him to do so.

With respect to the fourth element, the circumstances of Dudnauth's layoff do not give rise to an inference of discrimination on the basis of his age. Defendants argue that Dudnauth was laid off because the company eliminated two positions based on a decrease in sales, and that given he was hired by ABC Holdco at age 63, and laid off at age 64, the record does not suggest a causal connection between his layoff and his age. Doc. 37 at 11. Dudnauth argues only that by "specifically instructing [him] to stop submitting doctor's notes and subsequently firing him, couple[d] with their assertions that rug sales were down," an inference could be drawn that Defendants intended to fire him based on his age. Doc. 45 at 14–15. However, these communications provide no indicia that Defendants took Dudnauth's age into consideration whatsoever. While the Court does not assess the veracity of Defendants' purported justification for terminating Dudnauth, an alleged decrease in rug sales, it finds no evidence in the record giving rise to an inference of age discrimination. *See Bennett v. Watson Wyatt & Company*, 136 F. Supp. 2d 236, 246 (S.D.N.Y. 2001), *aff'd*, 51 F. App'x 55 (2d Cir. 2002) ("a plaintiff must proffer some admissible evidence of circumstances that would be sufficient to permit an

19

inference of discriminatory motive"). Dudnauth's conclusory statement that his "age, coupled with his disability, were the motivating factors for his termination," Doc. 45 at 15, is unsupported, and it therefore fails as a matter of law. *Griffin v. Ambika Corporation*, 103 F. Supp. 2d 297, 308 (S.D.N.Y. 2000) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." (quoting *Bickerstaff v. Vassar College*, 196 F.3d 435, 451–52 (2d Cir. 1999))); *Fincher v. Depository Trust & Clearing Corp.*, No. 06 Civ. 9959 (WHP), 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008) (explaining that "[a] plaintiff's self-serving statement, without direct or circumstantial evidence to support the charge," is insufficient for establishing a *prima facie* case of discrimination (citation omitted)); *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995) (explaining that, when a defendant "moves for summary judgment on the ground that there is an absence of evidence to support" an inference of discrimination, the plaintiff cannot meet his *de minimis* burden of producing such evidence "through reliance on unsupported assertions"). Therefore, the Court grants summary judgment on the age discrimination claim.

  *b. Disability Discrimination*

  In order to establish *a prima facie* case of disability discrimination, Dudnauth must show that: "(1) his employer is subject to the ADA; (2) he is disabled within the meaning of the ADA; (3) he is otherwise qualified to perform the essential functions of his job with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability." *Beaton v. Metropolitan Transportation Authority New York City Transit*, No. 15 Civ. 8056 (ER), 2018 WL 1276863, at *4 (S.D.N.Y. Mar. 2, 2018) (citing *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013)); *see also Penberg v. HealthBridge Management*, 823 F. Supp. 2d 166, 181 (E.D.N.Y. 2011) (NYSHRL). Defendants contest only the third and fourth elements of Dudnauth's *prima facie* case for disability discrimination, arguing that "there were no

other accommodations ABC HoldCo could have provided [Dudnauth] to perform his job." Doc. 37 at 12.

Starting with the fourth element, Dudnauth argues that "Defendants' actions while fully aware of [his] disability," specifically their "offering the severance agreement without inquiring about his condition or leave accommodation, refusal to accept [Dudnauth's] additional doctor's notes, and later termination prior to his doctor approved return date of July 4, 2022," together give rise to an inference of discrimination. Doc. 45 at 8. Defendants do not respond to this argument; they state only briefly and without elaboration that Dudnauth fails to meet the fourth element of the *prima facie* case, before turning to their argument that they had a legitimate business reason for terminating him. Doc. 37 at 12, 13. Based on Dudnauth's virtually unopposed argument, and construing the facts and drawing all reasonable inferences in his favor, *Brod*, 653 F.3d at 164, the Court finds that Dudnauth has sufficiently pled a discriminatory motive for purposes of the *prima facie* case. Dudnauth first informed ABC Holdco of his disability in early May, three to four weeks prior to his termination on June 6. *See* Doc. 46 ¶ 35; Doc. 45-1 at 11. This temporal proximity, coupled with ABC Holdco's alleged lack of receptiveness towards extending Dudnauth's leave, could lead a reasonable trier of fact to infer that Defendants were motivated by discrimination against Dudnauth for his disability. *See Baron v. Advanced Asset & Property Management Solutions, LLC*, 15 F. Supp. 3d 274, 283 (E.D.N.Y. 2014) ("[C]ourts in this circuit have held that the temporal proximity of an employee's disclosure of a disability to his termination support an inference of discrimination.").

However, as previously discussed, Dudnauth does not satisfy the third element, that he was "otherwise qualified to perform the essential functions of his job with or without reasonable accommodation," *Beaton*, 2018 WL 1276863, at *4, because there is no genuine dispute of material fact that no reasonable accommodation could have

enabled him to perform his job.  Therefore, Dudnauth fails to establish a *prima facie* case of disability discrimination, and the Court grants summary judgment on this claim.

Because each of Dudnauth's discrimination claims fails at the *prima facie* stage, the Court does not proceed to the second and third steps of the *McDonnell Douglas* burden-shifting framework.

### B.  Wage and Hour Claims

Dudnauth alleges that Defendants failed to pay him overtime wages, provide adequate wage notices, keep payroll records, and provide him with wage statements with each payment of his wages.  Doc. 1 ¶¶ 31–55.

Defendants argue that:  (1) to the extent Dudnauth's claims pertain to the time he worked at A.B.C. Carpet & Home, those are extinguished because the Bankruptcy Court approved ABC Holdco's purchase of A.B.C. Carpet & Home's assets "free and clear" of liabilities; (2) Dudnauth is an exempt employee under the FLSA and NYLL, and therefore not entitled to overtime wages, and in any event, he admits he did not work more than 40 hours per week at ABC Holdco; (3) Dudnauth received his wage statements; and (4) Dudnauth was not entitled to be paid once a week because he was not a manual laborer under New York law.  Doc. 37 at 4, 18.

#### 1.  *Liability for Violations by A.B.C. Carpet & Home*

As an initial matter, Defendants argue that Dudnauth waived any claim regarding his employment with A.B.C. Carpet & Home, because he "had the opportunity to submit any alleged claims to the trustee but elected not to do so," instead bringing his claims after the company was dissolved.  *Id.* at 17, 18.  Section 363 of the Bankruptcy Code allows a trustee or debtor in possession to sell property of the bankruptcy estate "free and clear" of creditors' interests.  11 U.S.C. § 363(b), (f).  Defendants point to the Bankruptcy Order, dated October 27, 2021, which:  (1) "approved the sale of all assets free [and] clear of any debts or liabilities to ABC HoldCo"; (2) held that the asset purchase agreement was entered "without collusion, in good faith, and from arm's-length

bargaining positions"; and (3) stated that "[n]either [ABC Holdco] nor any of its affiliates are successors to [A.B.C. Carpet & Home] or their estates of any theory of law or equity, and neither [ABC Holdco] nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of [A.B.C. Carpet & Home][.]"  Doc. 50 at 4–5.

In response, Dudnauth argues that equitable principles of successor liability apply in employment matters and specifically in this case.  Doc. 45 at 17.  However, Dudnauth does not specifically argue that the Bankruptcy Order does not apply to him or is otherwise improper.  Nor does he provide any authority for the argument that equitable principles of successorship preempt or supersede a legal and binding Bankruptcy Court order, even if those principles generally apply in employment matters.  Therefore, the Court finds no legal grounds to set aside the Bankruptcy Order's direction precluding liability against ABC Holdco for A.B.C. Carpet & Home's purported violations preceding the asset purchase agreement.[13]

The only factual assertion by Dudnauth that could theoretically call into question whether he is indeed precluded from asserting claims he did not assert during the bankruptcy, is his statement that as he "did not recall ever receiving notice, neither he nor his attorneys were able to file a notice of claim within the appropriate time period."  Doc. 46 ¶ 4(a).  However, the record reflects that Dudnauth did, in fact, receive notice of the bankruptcy and of his ability to file a notice of claim therein.  The affidavit of George F. Brenlla, Defendants' counsel in this civil matter, encloses an affidavit of service that was filed in the bankruptcy, by Jesse Brown, an employee of Stretto—the claims and noticing agent for the debtors in the bankruptcy.  *See* Doc. 38 ¶ 2.  That affidavit of service states that on October 8, 2021, Stretto served a "Notice of Bar Dates for Filing Proofs of

---

[13] Defendants argue that, "[t]o the extent Plaintiff attempts to assert claims against the individual defendants for the time he worked for [A.B.C. Carpet & Home], those claims are also extinguished" because any "claims against the individual defendants affect and would have affected the estate of the debtor, [A.B.C. Carpet & Home]."  Doc. 37 at 17, 18.  Dudnauth does not respond to this argument, and thus the Court deems it unopposed.

Claim," and an "Official Form 410 Proof of Claim Form & Instructions" on a number of recipients, via first-class mail. Doc. 38 at ECF 4. The affidavit of service encloses those forms, as well as the list of entities and individuals that were served with them; that list includes Dudnauth's name and address. *Id.* at ECF 41.

Therefore, Defendants' 56.1 statement that, on October 8, 2021, they served Dudnauth with notices and forms "with respect to the filing of claims with the bankruptcy court" is supported by the record. Doc. 46 ¶ 3. And although Dudnauth disputes that statement, his substantive explanation that he does not "recall receiving any notification of the bankruptcy," followed by a citation to his deposition testimony of the same, does not create a genuine dispute of material fact as to whether he was provided notice. Doc. 46 ¶ 3(a). Based on this record, Dudnauth is bound by the Bankruptcy Order, and he cannot now seek to hold Defendants liable for his claims against A.B.C. Carpet & Home. *Cf. In re Grumman Olson Industries, Inc.*, 445 B.R. 243, 254 (Bankr. S.D.N.Y. 2011) ("A sale order under § 363(f) that purports to free a purchaser from the debtor's liabilities does not bind parties in interest that did not receive appropriate notice of the sale." (citation omitted)), *aff'd*, 467 B.R. 694 (S.D.N.Y. 2012).

In sum, the Court will consider Dudnauth's wage and hour claims only to the extent that they pertain to his employment at ABC Holdco, not to his employment at A.B.C. Carpet & Home.

    *2. Overtime Wages Claim*

Defendants argue that Dudnauth was an "exempt employee" under the FLSA and was thus not entitled to overtime pay, and that in any event, he did not work overtime at ABC Holdco. Doc. 37 at 6. The FLSA was enacted to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers" and to ensure that employees are fairly compensated. *See* 29 U.S.C. § 202(a). The statute requires that employers pay overtime at a rate of not less than one and one-half times the employee's regular rate for hours

worked in excess of 40 per week.  *Id.* § 207(a)(1).  The FLSA, however, specifically provides for exemptions that exclude certain employees from its overtime provisions.  Specifically, the FLSA exempts employers from paying overtime to employees employed in a "bona fide executive, administrative, or professional capacity."  *Id.* § 213(a)(1).  Employees whose jobs fall within one of the enumerated exemptions are not entitled to overtime "no matter how many hours they work each week."  *Schwind v. EW & Associates, Inc.*, 357 F. Supp. 2d 691, 697 (S.D.N.Y. 2005) (citation omitted).

The Court finds that there is no genuine dispute of material fact that Dudnauth did not work overtime at ABC Holdco, and therefore, whether or not Dudnauth was an "exempt employee" is immaterial.  Dudnauth disputes Defendants' 56.1 statement that "[a]lthough [Dudnauth] was an exempt employee, he never worked more than 40 hours per week at any time during his employment at ABC Holdco."  Doc. 46 ¶¶ 33, 33(a).  However, Dudnauth states only that he "was not an exempt employee, as argued herein"—that is, he does not substantively dispute that he never worked more than 40 hours per week at ABC Holdco.  *Id.* ¶ 33(a).  Moreover, while Dudnauth disputes Defendants' 56.1 statement that, "[a]t ABC Holdco, Plaintiff always worked from 10:00 am to 6:00 pm, five days per week, with a meal period each day," the record does not bear out a genuine dispute as to his hours at ABC Holdco.  *Id.* ¶¶ 32, 32(a).  In his response to that 56.1 statement, Dudnauth claims that his "usual schedule was 9:30 a.m. to 7:00 p.m. five days per week, then changed to 10:00 a.m. to 6:00 p.m. five days per week."  *Id.* ¶ 32(a).  However, in his deposition, Dudnauth clearly testified that the 9:30 a.m. to 7:00 p.m. schedule applied to his work at A.B.C. Carpet & Home, not his work at ABC Holdco.  *See* Doc. 45-1 at 49 ("Q.  What hours did you work at the old company?  A.  Approximately, 9:30 to seven.").  By contrast, when testifying about ABC Holdco, Dudnauth clearly testified that his shifts there were consistently from 10:00 a.m. to 6:00

p.m. *See id.* at 42–44.[14]  Therefore, the record reflects that Dudnauth worked eight hours per day at ABC Holdco, and given there is no evidence that he worked more than five days per week, there is no genuine dispute of material fact that his work did not exceed 40 hours per week.  Accordingly, the Court need not reach the question of whether Dudnauth was entitled to overtime pay under the FLSA in the first place.  The Court grants summary judgment on the claim of failure to pay overtime wages.

    *3. Wage Statements and Notice of Pay Claims*

The NYLL requires employers to provide employees with wage statements showing:

> a statement with every payment of wages, listing . . . the dates of work covered by that payment of wages . . . whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage . . . the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked.

---

[14] The relevant excerpt from the deposition is as follows:

    Q.  Do you recall at the new company what your hours were?
    A.  Eight hours a day.
    [. . .]
    Q.  So what day – what time would you come in?
    [. . .]
    A.  Normally, I come in around 9:30 to 10:00.
    Q.  And when you would you leave?
    A.  Six o'clock.
    Q.  So I'm confused.  When you say 9:30, 10:00, when did your shift start?
    A.  10:00.
    [. . .]
    Q.  With the new company did you ever work past six o'clock?
    A.  Sometimes like – sometimes I stay a couple of minutes after six, but I don't know – most of the time it's six o'clock.
    Q.  Okay.
    A.  Yeah, six o'clock.  Six o'clock.
    Q.  So with the new company it's always six o'clock?
    A.  Yes, six o'clock.
    Q.  And was it always 10:00 with the new company –
    A.  Yeah.
    Q.  – when you started?
    A.  Yes, 10:00.

Doc. 45 at 42–44.

NYLL § 195(3). In his complaint, Dudnauth claimed that "Defendants willfully failed to provide [him] with any wage statements, upon each payment of his wages, as required by NYLL § 195(3)." Doc. 1 ¶ 54. However, Dudnauth nowhere contests Defendants' assertion that he did in fact receive his wage statements and notice of pay. *See* Doc. 37 at 18. Nor does Dudnauth make any other argument in further support of the allegation in his complaint. Therefore, the Court deems Dudnauth's claim that Defendants violated § 195(3) abandoned. *See Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 644–46 (S.D.N.Y. 2015) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." (internal quotation marks omitted) (quoting *Maher v. Alliance Mortgage Banking Corp.*, 650 F. Supp. 2d 249, 267 (E.D.N.Y. 2009))); *Silverman v. Miranda*, 116 F. Supp. 3d 289, 303 (S.D.N.Y. 2015) ("To support a finding of abandonment, Defendants must show that Plaintiffs either (1) raised a claim and failed to pursue that claim, or (2) failed to respond to an argument raised by Defendants."), *aff'd sub nom. Silverman v. Teamster Loc. 210 Affiliated Health & Insurance Fund*, 725 F. App'x 79 (2d Cir. 2018), *as amended* (June 7, 2018).

### 4. *Weekly Pay Claim*

Defendants argue that Dudnauth was not a laborer entitled to be paid every week, and in any event, "at the time of hire by ABC HoldCo, [Dudnauth] was informed in writing about . . . [the] bi-monthly nature of his pay[.]" Doc. 37 at 20.

Under NYLL § 191(1)(a)(i), a "manual worker" is required to be paid weekly and not later than seven calendar days after the end of the week in which the wages are earned. NYLL § 191(1)(a)(i). Thus, whether the wages were paid on a timely basis turns on the question of whether Dudnauth was a manual worker.

A manual worker is defined as "a mechanic, workingman or laborer," *id.* § 190(4), and the New York State Department of Labor ("NYSDOL") has interpreted the term to include "employees who spend more than 25 percent of their working time

27

performing physical labor," with "'physical labor' broadly includ[ing] a wide range of physical activities undertaken by employees . . . . " N.Y. Dep't of Labor Opinion Letter, No. RO-09-0066 (May 21, 2009).[15]  In general, the NYSDOL looks at the duties performed by an employee in order to determine whether he or she is a manual worker and makes a case-by-case determination.  *See* N.Y. Dep't of Labor Counsel Opinion Letter RO–09–0066, May 21, 2009.  The New York Industrial Board of Appeals' analysis to determine whether an employee is a "manual worker" not only looks at the time spent performing physical labor, but also to the type of labor performed:

> [T]he traditional notion of a manual worker, the "mechanic, workingman or Laborer" generally includes a sense of interchangeable physical labor that can be done by multiple individuals with the capacity to move material or things from one place to another.  A common laborer may dig a ditch, he or she may not have dug a ditch before but they can be shown how to do so in a matter of minutes and then be left to dig in the designated area . . . [a non-manual worker] in contrast, is not a lowskilled job that anyone walking into a [job site] can do.  It is a skilled position . . . The position requires sensitive interaction . . . It requires specialized training and attention.

*Hudson Valley Mall Dental v. Commissioner of Labor*, PR 12-034 at 5–6 (New York Industrial Board of Appeals, August 17, 2014).

Here, the Court finds that there is at least a genuine dispute of material fact as to whether Dudnauth was a manual laborer under the NYLL.  Dudnauth states that his "primary duty was performing manual labor for the Defendants," Doc. 46 ¶ 13(a), and he elaborates that his roles of rug flipper and stocker included "turning rugs with other employees for customers in the store to view and potentially purchase," and "stock[ing] these rugs and put[ting] them away."  Doc. 45-2 ¶ 3; *see also* Doc. 46 ¶¶ 14(a), 15(a).

---

[15] New York courts have consistently held that the NYSDOL's "interpretation of a statute it is charged with enforcing is entitled to deference."  *Barenboim v. Starbucks Corp.*, 21 N.Y.3d 460, 470 (2013) (quoting *Samiento v. World Yacht Inc.*, 10 N.Y.3d 70, 79 (2008)); *see also State v. GTE Valeron Corp.*, 553 N.Y.S.2d 555, 557 (1990) ("Judicial deference should therefore be accorded the interpretation by the [New York] Department of Labor . . . .").  In addition, New York courts have held that "regulations by the agency responsible for [statutory] administration, if not irrational or unreasonable, should be upheld."  *Howard v. Wyman*, 28 N.Y.2d 434, 438 (1971).  "The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body."  *Id.* (internal quotation marks and citation omitted).

These tasks precisely reflect the kind of "interchangeable physical labor that can be done by multiple individuals with the capacity to move material or things from one place to another." *Hudson Valley Mall Dental*, PR 12-034 at 5–6.

Defendants' only statement in opposition, that Dudnauth's "major functions were not as a laborer," is conclusory. Doc. 37 at 20. Moreover, to the extent Defendants argue that Dudnauth had supervisory responsibilities such as scheduling shifts, recommending who to hire and fire, and disciplining employees, Doc. 46 ¶ 15, these facts—about which there is independently a genuine dispute—do not necessarily foreclose a finding that Dudnauth was primarily a manual worker. Therefore, Defendants do not meet their burden of demonstrating the absence of any genuine issue of material fact as to Dudnauth's role as a manual laborer. *Celotex*, 477 U.S. at 323.

Additionally, although Defendants argue that Dudnauth "was informed in writing" that he would be paid on a bi-monthly basis, Doc. 37 at 20, they provide no authority for the proposition that an employer can contractually exempt themselves from the NYLL's weekly payment requirement. The Court thus denies summary judgment on the failure to pay on a weekly basis claim.

## IV.    CONCLUSION

For the reasons set forth above, the motion is granted in part and denied in part. Summary judgment is granted on all NYSHRL claims, the claims of failure to pay overtime wages, and the claims of failure to provide adequate wage statements and notice of pay. However, summary judgment is denied as to the NYLL claim against Defendants for failure to pay Dudnauth on a weekly basis during his employment at ABC Holdco.

The parties are directed to appear for a conference on August 7, 2025, at 11:30 a.m., in Courtroom 619 of the United States Courthouse, 40 Foley Square, New York, NY 10007.

The Clerk of Court is respectfully directed to terminate the motion, Doc. 35.

It is SO ORDERED.

Dated:    July 29, 2025
          New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.